UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MEADE ELECTRIC COMPANY, Inc.,**

        Plaintiff,

  -vs-                                        Case No. 12-C-1014

**MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,**

        Defendant.

---

## DECISION AND ORDER

---

Meade Electric Company, Inc. contracted with the Milwaukee Metropolitan Sewerage District ("MMSD" or "the District") to construct an underground landfill gas pipeline. Meade completed the construction work on time and was ultimately paid $16,372,113 for the project. At issue in this lawsuit is Meade's removal of nearly five million gallons of groundwater from an "open cut" portion of the pipeline nearing the Jones Island Water Reclamation Facility ("WRF") in downtown Milwaukee. Pursuant to a contract specification, Meade claims that it is entitled additional compensation for this work at a rate of $1.00/gallon. In the alternative, Meade seeks compensation under equitable theories of unjust enrichment and/or quantum meruit. The parties are diverse, so the Court may exercise jurisdiction. 28 U.S.C. § 1332(a)(1).

Now before the Court is MMSD's motion for summary judgment. In opposition, Meade argues that it is entitled judgment independent of the motion on its breach of contract claim. Fed. R. Civ. P. 56(f)(1). For the reasons that follow, MMSD

is entitled to summary judgment on the contract claim. However, Meade can proceed on its claims for equitable relief.

## BACKGROUND

MMSD is a special purpose municipal entity providing wastewater treatment and flood management throughout Milwaukee County and in municipalities adjacent thereto. MMSD owns and operates a system of sewers that collect and convey sewage to District-owned water reclamation facilities for treatment and disposal.

In 2009, the Milwaukee Sewerage Commission decided to build a landfill gas pipeline and turbine facility to address the high cost of energy. The pipeline begins at the Emerald Park Landfill in Muskego and conveys gas to the District's WRF on Jones Island. The District hired CDM, an engineering design firm, to design the pipeline and to provide contract documents, plans, and specifications for construction of the pipeline. Bids were solicited for construction of a pipeline utilizing two alternate routes. The Commission chose Alternate 2 which required a shorter distance of excavation and included a pre-existing steel pipeline that the District had purchased. Meade was the low bidder on Alternate 2.

In August 2010, Meade began excavation from approximately Bay Street north along South Harbor Drive toward the Jones Island WRF – a section roughly 4,000 feet in length, illustrated by this photo:



ECF No. 30, Affidavit of Linda Mooney, Ex. D7. The construction method was "open

- 3 -

cut," which means that the contractor digs a trench, installs appropriate bedding material, such as gravel, and lays in the pipe. The Jones Island peninsula consists primarily of filled material and has a high groundwater table. Although the trench excavation was only about eight feet deep, Meade needed to remove groundwater from the trench in order to lay the pipe in a dry environment. Meade removed groundwater from the trench and pumped it into two settling tanks. From the settling tanks, the water was discharged into a District-owned manhole for conveyance via a District sewer to the Jones Island WRF. In total, Meade pumped 4,997,597 gallons of groundwater from the excavated trench on Jones Island.

Under Bid Item No. 5, which references Specification 02065 ("Contaminated Groundwater Removal"), Meade bid $1.50/gallon for an estimated 15,000 gallons of "Wastewater Disposal." LFG 000042.[1] During the course of construction, Meade provided notice that it was going to exceed 15,000 gallons, reserving its right to submit a claim under Bid Item No. 5. MMSD never attempted to negotiate a modification of unit pricing, as was its right under certain circumstances. On November 16, 2011, Meade submitted a claim under Bid Item No. 5, reducing the unit price to $1.00 under the logic that it did not have to containerize the water and ship it off-site for disposal. MMSD refused the claim. Meade pursued the claim review process set forth in the contract, but did not prevail.

---

[1] ECF No. 28, the Affidavit of Gregory Olson, incorporates the relevant portions of the contract. The Court will reference the index number for citation purposes.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

### I.  Breach of contract

This motion requires the Court to interpret various provisions of the Landfill Gas Pipeline Project Contract, Volume I (out of III), a massive document that is over 1,100 pages long. The parties agree that Wisconsin law applies. Under Wisconsin law, the "primary goal in interpreting a contract is to determine and give effect to the parties' intent. When the language of a contract is unambiguous, [courts] will apply its literal meaning." *Steinmann v. Steinmann*, 749 N.W.2d 145, 153 (Wis. 2008). A contract is ambiguous if it is reasonably susceptible to more than one meaning. In such instances, "any ambiguity is to be interpreted against the drafter." *Gorton v.*

*Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 623 (Wis. 1998). However, the mere fact that the parties disagree about the meaning of a contract does not make it ambiguous if the Court concludes that "only one meaning applies in the context and comports with the parties' objectively reasonable expectations." *Sprangers v. Greatway Ins. Co.*, 514 N.W.2d 1, 7 (Wis. 1994). The contract must be "considered as a whole in order to give each of its provisions the meaning intended by the parties." *McCullough v. Brandt*, 148 N.W.2d 718, 720 (Wis. 1967).

As noted, Meade argues that it is entitled to recover pursuant to its bid for "Wastewater Disposal" under Specification 02065. The logic behind Meade's claim originates in Specification 02064, which applies to Contaminated Soils Removal. It is undisputed that contaminated soils were found in the open trench excavation. Specification 02064 provides that if "water is present in the excavation area, Contractor shall handle the water as outlined in Section 02065, CONTAMINATED GROUNDWATER REMOVAL." LFG 000550. Correspondingly, Specification 02065 is "for the removal of perched[2] contaminated groundwater from the Remediation Area excavations by pumping or other methods approved by the Engineer." LFG 000553. "Wastewater," a term that is used interchangeably and confusingly with the phrase "contaminated groundwater," is defined as "[g]roundwater and storm water which comes in contact with the contaminated soil in excavation areas

---

[2] In the field of geology, "perched" groundwater is defined as "unconfined ground water separated from an underlying main body of ground water by an unsaturated zone." Bates and Jackson, American Geological Institute, "Glossary of Geology," 3rd Ed. (1987), at 492.

- 6 -

or decontamination water." LFG 000554. The "Remediation Area" is "[a]ny area where contaminated soil is present." *Id.*

The Court agrees that Specification 02065 applies – at minimum, there is a genuine issue of fact as to its applicability – but this does not mean that Meade is entitled to reimbursement under Bid Item No. 5. First of all, Specification 02065 provides that the Contractor shall:

> Provide temporary storage of contaminated groundwater in WisDOT-approved 55-gallon drums or other WisDOT-approved containers.
>
> Load the contaminated groundwater and transport the contaminated groundwater to an EPA permitted disposal facility.
>
> Submit a valid State of Wisconsin special waste and/or hazardous waste license for the transporter.
>
> Provide payment of disposal facility fees.
>
> Prepare manifests and acquisition of disposal permit, authorizations, approvals, etc.

LFG 000554. Meade did none of these things. Meade argues that it didn't have to because it disposed of the water by "other methods approved by the Engineer," i.e., it pumped the water into storage tanks and then discharged the water into the sewer system. However, Specification 02065 specifically contemplates this outcome when, as here, the wastewater has "contamination concentrations less than the maximum pollution concentration limits." LFG 000557 (continuing to note that wastewater with less than the maximum pollution concentration levels must be "Pumped into an existing on-site manhole which leads directly to the MMSD sewerage system . . .").

- 7 -

Case 2:12-cv-01014-RTR   Filed 10/16/13   Page 7 of 15   Document 40

On the other hand, wastewater that "exceeds the applicable pollution concentration limits, must be disposed of off-site at an approved permitted facility in compliance with applicable local, state and federal regulations." *Id.* To reiterate, it is undisputed that the water removed by Meade did not exceed the applicable pollution concentration limits.

There is a distinction to be made here between "disposal" and "removal." The entirety of Specification 02065 applies to the removal of wastewater/contaminated groundwater. LFG 000553 ("This specification is for the *removal* of perched contaminated groundwater from the Remediation Area excavations by pumping or other methods approved by the Engineer") (emphasis added). However, Bid Item No. 5 uses the phrase "Wastewater *Disposal*." It is undisputed that Meade removed almost five million gallons of wastewater/contaminated groundwater. But what happens after this water is removed depends, as noted above, on how polluted the water is. To be sure, Meade disposed of the water in a general, colloquial sense, but Meade did not "dispose" of the water in the formal, specific manner contemplated by Specification 02065. That is, Bid Item No. 5 only applies to water that is contaminated to the point that it must be "disposed of off-site at an approved permitted facility in compliance with applicable local, state and federal regulations." This reading is reinforced by the "<u>PAYMENT</u>" section of Specification 02065: "Payment for

- 8 -

*disposal* of containment[3] groundwater will be made at the unit price per gallon stated in the Bid Item Wastewater Disposal. All other work specified in this section is considered incidental and shall be included in the unit price." LFG 000558 (emphasis added).

This interpretation makes sense in light of the fact that the initial bid estimate was only for 15,000 gallons. It is unreasonable to conclude that MMSD would miss the mark so badly in its estimate, especially since the Jones Island peninsula has a high groundwater table. The contract does include a provision allowing the parties to re-negotiate unit price if the original quantity is greatly exceeded. LFG 000432, Section 59(A) ("In the event the Modification results in a change in the original quantity in excess of fifteen percent (15%) of the original bid quantity, and the total dollar value of that bid item is significant, the Owner will review the unit price to determine if a new unit price shall be negotiated"). $1.50/gallon is an awkward starting point when millions of gallons are in play, even on the assumption that the parties are required to negotiate in good faith. Ultimately, there is nothing in the contract which requires the contractor to accept a unit price modification.

Moreover, off-site disposal in compliance with environmental regulations is obviously more costly than the on-site release of water into the sewer system. The

---

[3] Meade argues that this is a typographical error that should read "contaminated groundwater," not "containment groundwater." The difference would not alter the Court's reasoning. The key point is that the removed groundwater did not trigger the disposal provisions in the specification. However, the word "containment" supports the Court's interpretation as a possible reference to the use of WisDOT-approved containers for off-site disposal.

- 9 -

District estimates that Meade incurred approximately $115,440.00 in costs and expenses for this work. Meade disagrees, estimating its costs at $866,247.00. ECF No. 35-5, Affidavit of Joshua Levy, Ex. 5. Either way, Meade would be getting a windfall, providing further confirmation that its interpretation does not comport with reasonable expectations. *Dakota, Minn. & E. R.R. Corp. v. Wis. & S. R.R. Corp.*, 657 F.3d 615, 620 (7th Cir. 2011) ("Inferring the meaning of a contract from the contract price is a legitimate tool of interpretation"). It is impossible to imagine that the parties contemplated a 30-45% price increase[4] on the project for work that didn't even delay completion. "Generally the contract price is roughly equivalent to the value of the contractual performance. . . . An enormous disparity between price and value is a clue that something may be amiss." *Sutter Ins. Co. v. Applied Sys., Inc.*, 393 F.3d 722, 726 (7th Cir. 2004).

Accordingly, MMSD is entitled to summary judgment on Meade's claim for breach of contract.

## II. Equitable remedies

In the alternative, Meade brings claims for quantum meruit and unjust enrichment. "Though related in theory and residing in the domain of contract law under the heading of quasi-contract, each of these claims has its own distinct elements of proof and measure of damages." *Lindquist Ford, Inc. v. Middleton Motors, Inc.*,

---

[4] Meade lowered its demand from $1.50/gallon to $1.00/gallon, but nothing in the contract required it to do so.

557 F.3d 469, 476 (7th Cir. 2009) (discussing Wisconsin law). Unjust enrichment is "grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Id.* at 477 (quoting *Watts v. Watts*, 405 N.W.2d 303, 313 (Wis. 1987)). Under quantum meruit, a plaintiff can recover "even if he confers no benefit on the defendant" by showing that "the defendant requested the [plaintiff's] services" and "the plaintiff expected reasonable compensation" for the services. *Id.* at 477-78 (quoting *Ramsey v. Ellis*, 484 N.W.2d 331, 333 (Wis. 1992)).

In Wisconsin, "claims for unjust enrichment and quantum meruit only apply where the services performed were not covered by the parties' contract, where the contract is invalid or where the contract is unenforceable." *United States ex rel. Roach Concrete, Inc. v. Veteran Pacific, JV*, 787 F. Supp. 2d 851, 858 (E.D. Wis. 2011). MMSD argues that the removal of groundwater is governed by Specification 02530 ("Control of Water"), which provides that payment "shall be considered incidental to the pipeline and included in the unit price for Install HDPE Pipe, Open Cut stated in the Bid." LFG 000671; *see also* LFG 000047 (Bid Item No. 14, "Install HDPE Pipe, Open Cut"). However, the Court already explained its view that Specification 02065 applies due to the presence of contaminated soil. If so, then Meade wasn't paid anything for removing almost five million gallons of wastewater/contaminated groundwater because the disposal provisions were never triggered, and all other work under Specification 02065 is considered "incidental" and "included in the unit price"

for disposal. LFG 000558. In other words, the parties agreed that payment for services under Specification 02065 would be governed by unit price, but only on the assumption that a substantial amount of wastewater/contaminated groundwater would require off-site disposal. Accordingly, Meade can pursue equitable relief because its claim is not "governed by the contract existing between the parties." *Gorton v. Hostak, Henzl & Bichler*, 577 N.W.2d 617, 624 n.13 (Wis. 1998); *see also Martineau v. State Conservation Comm'n*, 194 N.W.2d 664, 667 (Wis. 1972) (quantum meruit applies when an attorney "renders services in addition to those contemplated by the contingent fee arrangement").

MMSD argues that Meade cannot prove its damages to a reasonable degree of certainty. As the Court already noted, Meade estimated its removal costs at $866,247.00. The "reasonable certainty" requirement "does not mean that a plaintiff must prove damages with mathematical precision; rather, evidence of damages is sufficient if it enables the jury to make a fair and reasonable approximation." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 80 (Wis. 1996). Meade's estimate is more than enough to create an issue of fact for trial. MMSD also argues that Meade's estimate is inadmissible because it was created in the context of a settlement offer. Fed. R. Evid. 408 (settlement offer is not admissible "to prove or disprove the validity or amount of a disputed claim"). Meade invoked Rule 408 in response to MMSD's discovery requests, but this does not mean that the underlying evidence in support of its estimate is also inadmissible. Clearly, Meade had some sort

- 12 -

Case 2:12-cv-01014-RTR    Filed 10/16/13    Page 12 of 15    Document 40

of evidentiary support to arrive at its settlement offer. For present purposes, that is enough to survive summary judgment.

### III.     Alternative dispute resolution

Finally, MMSD argues that Meade's claims are precluded by the dispute resolution provisions set forth in the contract. Article 57 (DISPUTES), LFG 000431. These procedures culminate in an appeal to MMSD's Executive Director or its Designated Representative, who is charged with "render[ing] a decision which shall be final and conclusive under this Contract." *Id.* At this level of review, MMSD's designee, Paul Lohmiller, concluded that Meade did not "dispose" of any contaminated groundwater under Specification 02065. However, Mr. Lohmiller also found that Meade had an allowable claim for "incidental costs" and suggested that MMSD and Meade "would be better suited to negotiate which costs would be applicable to this claim." ECF No. 27, at 18.

Article 58 (REMEDIES) provides that unless "otherwise provided in this Contract, *or not resolved under the Article DISPUTES of these GENERAL CONDITIONS*, all claims, counterclaims, disputes and other matters in question (the 'Dispute') between the Owner and the Contractor arising out of or relating to this Contract or the breach of it will be decided first by non-binding mediation before a mutually agreed upon mediator in Milwaukee County." LFG 000431 (emphasis added). Further, if "the Dispute is not resolved within thirty (30) days after it was submitted to the mediator, the Dispute will be settled by arbitration, if the parties

- 13 -

Case 2:12-cv-01014-RTR   Filed 10/16/13   Page 13 of 15   Document 40

mutually agree, or in a court of competent jurisdiction within the State of Wisconsin."
*Id.*

Mr. Lohmiller's decision as it pertains to the disposal of contaminated groundwater under Specification 02065 is "final and conclusive." Therefore, it is an alternative ground for granting summary judgment in favor of MMSD on Meade's breach of contract claim. *See, e.g., Omni Tech Corp. v. MPC Solutions Sales, LLC*, 432 F.3d 797, 799 (7th Cir. 2005) (under Wisconsin law, a provision for "'final, conclusive and binding' resolution . . . by someone other than a federal judge must be honored"). However, Lohmiller's decision was not "final and conclusive" with respect to Meade's "incidental costs incurred for handling of wastewater that did not exceed the applicable allowable limits in the Remediation Area as a result of Bid Item 5 actual quantity being zero gallons of contaminated groundwater." ECF No. 27, at 18. In other words, Lohmiller's decision does not preclude Meade's pursuit of equitable remedies. That aspect of Meade's claim was left unresolved, so Meade is entitled to pursue relief here in federal court.

Curiously, neither party mentioned the requirement that an unresolved claim "be decided first by non-binding mediation before a mutually agreed upon mediator in Milwaukee County." The parties may have satisfied this requirement, but there is nothing in the record to suggest that they did. In the Court's view, the parties must comply with this requirement because Meade's equitable claims were not resolved under Article 57, and despite their extra-contractual nature, Meade's claims "aris[e]

out of or relat[e] to this Contract . . ." LFG 000431. If the parties didn't submit Meade's claims to a mediator, they must do so prior to the ultimate resolution of this case. Otherwise, the Court's jurisdiction to enter a final judgment could be called into question. The Court can refer this matter to Magistrate Judge William E. Callahan for mediation if his services are "mutually agreed upon."

***

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. MMSD's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion; and

2. Within **ten (10) days** of the date of this Order, the parties must jointly advise the Court regarding their plans to comply with Article 58 (REMEDIES) as it pertains to non-binding mediation.

Dated at Milwaukee, Wisconsin, this 16th day of October, 2013.

**BY THE COURT:**

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**